1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10    WESTERN WASHINGTON PAINTERS          CASE NO. C09-826-RSM
      DEFINED CONTRIBUTION PENSION
11    TRUST, EMPLOYEE PAINTERS' TRUST      ORDER ON BENCH TRIAL
      HEALTH AND WELFARE FUND,            GRANTING JUDGMENT IN FAVOR
12    WESTERN WASHINGTON                   OF PLAINTIFFS
      APPRENTICESHIP AND TRAINING
13    TRUST, WESTERN WASHINGTON
      PAINTERS' LABOR MANAGEMENT
14    COOPERATION TRUST,
      INTERNATIONAL UNION OF PAINTERS
15    AND ALLIED TRADES INDUSTRY
      PENSION FUND, and INTERNATIONAL
16    BROTHERHOOD OF PAINTERS AND
      ALLIED TRADES INDUSTRY PAINTERS
      DISTRICT COUNCIL NO. 5,
17
                         Plaintiff,
18
              v.
19
      WESTERN INDUSTRIAL, INC. a
20    Washington corporation, MARK L.
      JACKSON and JANE DOE JACKSON,
21    husband and wife, and the marital community
      comprised thereof, and APPLICATORS,
22    TOOL AND EQUIPMENT, INC., a
      Washington corporation,
23
                         Defendant.
24

ORDER ON BENCH TRIAL GRANTING JUDGMENT IN FAVOR OF PLAINTIFFS - 1

# I. INTRODUCTION

This case arises out of an audit of then-unionized Western Industrial Inc. (the "Employer") for the time period of November 1, 2007 through June 30, 2009 by Plaintiffs Western Washington Painters Defined Contribution Pension Trust, Employee Painters' Trust Health and Welfare Fund, Western Washington Apprenticeship and Training Trust, Western Washington Painters' Labor Management Cooperation Trust, and International Union of Painters and Allied Trades Industry Pension Fund (collectively the "Trust Funds"), and International Brotherhood of Painters and Allied Trades Industry Painters District Council No. 5 (the "Union"). Trust Funds auditor Andrew Walker from Lindquist LLP generated an audit dated August 2, 2010, which was subsequently revised, that showed an alleged trust fund contribution and union dues shortfall of $194,000 with additional liquidated damages of roughly $21,000, interest of roughly $29,000 and audit fees of $25,000. Informal discussions between the Trust Funds and the Employer resulted in a reduction in the audit amount based upon an agreement that certain individuals were not performing bargaining unit work during the audit period.

One issue remains in dispute: whether the Employer owes trust fund contributions on behalf of certain unreported employees who were classified as "utility workers" by the Employer. Under the collective bargaining agreement, the Employer is not obligated to pay trust fund contributions on behalf of utility workers. The Trust Funds argue that the employees in question were not utility workers, but were journeyman painters. Defendants insist that the employees at issue performed utility work.

A bench trial was held in this matter from Monday, November 7, 2011 through Wednesday, November 9, 2011. Plaintiffs were represented by their counsel Robert A. Bohrer and Diane L. Cushing. Defendants' Western Industrial, Inc. (the "Employer"), Applicators,

Tools and Equipment, Inc. ("Applicators"), and Mark L. Jackson and Jane Doe Jackson, husband and wife, and the marital community comprised thereof ("Jackson") were represented by their counsel Judd Lees.  The Court has fully considered the evidence presented at trial, the exhibits admitted into evidence, and the argument of counsel, and being fully advised, now makes the following Findings of Fact and Conclusions of Law, and renders a decision.[1]

## II. FINDINGS OF FACT

**A.**   <u>**Jurisdiction And Venue.**</u>

1.   Jurisdiction is conferred on this Court by § 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185(a) and §§ 502(a)(3) and 502(e)(2) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(3) and 1132(e)(2).

2.   The Employer and Applicators are engaged in business within the jurisdiction of this Court, and such business affects commerce within the meaning of § 301(a) of the LMRA.

**B.**   <u>**The Parties.**</u>

3.   The Trust Funds are joint labor-management employee benefit Trust Funds created pursuant to LMRA § 302(c)(5), 29 U.S.C. § 186(c)(5).  The plans administered are "Multi-employer Plans" to which more than one employer is required to contribute, which are maintained pursuant to one or more Collective Bargaining Agreements, and which satisfy requirements of the Secretary of Labor.  The said plans are administered in Seattle, King County, State of Washington.

4.   The Union is a labor organization with its offices located in King County.

---

[1] As set forth below, the Court largely adopts Plaintiffs' Amended and Final Proposed Partial Findings of Fact and Conclusions of Law.  *See* Dkt. #46.  The Court also incorporates portions of Defendants' Proposed Supplemental Findings of Fact and Conclusions of Law.  *See* Dkt. # 45.

5.      The Employer is a marine sandblasting and painting company solely owned and operated by Defendant Mark Jackson.  The Employer conducts business in the Western United States.

6.      Defendant Applicators, a Washington corporation, is an equipment and labor rental business also solely owned and operated by Jackson.  It only engages in business with the Employer.

**C.      The Shipyard Agreement By And Between Western Industrial, Inc. And International Union of Painters and Allied Trades District Council #5 ("Shipyard Agreement")**

7.      The Employer and the Union entered into a collective bargaining agreement entitled, "Shipyard Agreement by and between Western Industrial, Inc. and International Union of Painters and Allied Trades District Council #5" ("Shipyard Agreement") dated April 1, 2001.

8.      The Shipyard Agreement was in full force and effect at all times herein.

9.      The Shipyard Agreement covers:

[A]ll production repair, and maintenance employees within the bargaining unit in the employ of the Employer signatory hereto, and shall apply to all work and activities of the Employer in connection with the construction, conversion, painting, repair or scrapping of any vessel on the Pacific Coast including, but not limited to dredges, floating, drydocks, offshore drilling vessels, barges, mobile drilling platforms, and all auxiliary equipment used in conjunction therewith.

10.      Under the terms of Article 19 of the Shipyard Agreement, "Fringe Benefits shall be paid in accordance with the current Western Washington Area Agreement for the Painting Industry [("Area Agreement")]," effective for the period March 1, 2005 through February 28, 2010.

**D.      Fringe Benefit Contributions Under The Western Washington Area Agreement for the Painting Industry ("Area Agreement")**

11.      The Area Agreement was in full force and effect at all times herein.

**1.      Fringe Benefit Contribution Rates**

ORDER ON BENCH TRIAL GRANTING JUDGMENT IN FAVOR OF PLAINTIFFS - 4

12.     Under the terms of Section 20.2 of the Area Agreement, "[e]ach signatory Employer shall continue to provide Health & Welfare coverage through the Painters Health & Welfare Trust and shall make contributions to that Trust at the rate of $4.35 per compensable hour." The contribution rate increased to $4.55 on March 2, 3007, and to $4.65 on November 1, 2007.

13.     Under the terms of Section 20.3 of the Area Agreement, "[t]he Employer shall pay into the Western Washington Painters and Allied Trades Apprenticeship and Training Trust fifty cents ($0.50) per compensable hour for all Journeymen, Painters P1-P4, and Apprentices on a monthly basis."

14.     Under the terms of Section 20.4 of the Area Agreement, "[t]he Employer shall continue to pay into the Western Washington Pension Plan for Journeymen, Painters P1-P4, and Apprentices, starting with the 4th Bracket, at the rate of 5% of gross wages (exclusive of fringes). The Employer will also make payments into the IUPAT Pension as described in Section 20.6."

15.     Under the terms of Section 20.5 of the Area Agreement, "[t]he Employer shall pay into the LMCI Trust Fund at the rate of five cents ($0.05) per compensable hour for all Journeymen, Painters P1 – P4, and Apprentices."

16.     Under the terms of Section 20.6.1(a) of the Area Agreement, "[f]or each hour or portion thereof for which an Employee, except as stated in Article 17.8, receives pay, the Employer shall make a contribution of eighty cents ($0.80), increased to ninety five cents ($0.95) in 2008, one dollar twenty cents ($1.20) in 2009, to be allocated to the IUPAT Union and Industry Pension Plan."

17.     Under the terms of Section 20.6.1(b) of the Area Agreement, "[f]or the purpose of this Article, each hour paid for, including hours attributable to show up time, and other hours for which pay is received by the Employee in accordance with the Agreement, shall be counted as hours for which contributions are payable."

18.     Under the terms of Section 20.6.1(c) of the Area Agreement, "[c]ontributions shall be paid on behalf of any Employee starting with the Employee's first day of employment in a job classification covered by this Agreement.  However, no contributions shall be made on behalf of Utility Workers or Pre-Apprentices."

19.     The Shipyard Agreement does not refer to nor define journeymen, painters 1-4, apprentices, pre-apprentices or utility workers.

20.     Pursuant to Section 3.3 of the Area Agreement, Painters are "persons qualified in the industry who have completed an apprenticeship program or have passed the necessary examinations as to proficiency as a mechanic to perform the duties pertaining to the Painting, Decorating and Drywall Industry as an Employee, and who have met the standards for assignment as a Journeyman, Painter 1, Painter 2, Painter 3, or Painter 4 and who does not contract."  Under the terms of the Area Agreement, journeymen and painters received a wage rate in the range of $19.91 through $26.20 as of November 1, 2007, $20.37 through $26.80 as of March 1, 2008, and $20.82 through $27.40 as of March 1, 2009.  (Pls.' Ex. 2, Sch. A.)

21.     Apprentices are "persons who are learning the Painting, Decorating and Drywall trade who have been accepted by the local Painting, Decorating and Drywall Joint Apprenticeship and Training Committee and are registered with the Washington State Apprenticeship Council."  (Pls.' Ex. 2, § 3.4.)  Under the terms of the Area Agreement, apprentices received a wage rate in the range of $13.62 through $18.86 as of November 1, 2007, $13.94 through $19.30 as of March 1, 2008, and $14.25 through $19.73 as of March 1, 2009. (Pls.' Ex. 2, Sch. A.)

22.     Section 2.1 of the Area Agreement defines the work performed by journeymen, painters 1-4 and apprentices to include painting and drywall work," including, but not limited to:

> All painting, coating, caulking, lining, decorating, fabric-panel systems, paperhanging, including the hanging of vinyl's, canvas, tacking on of muslin and all material of whatever kind or quality applied to walls, floors, or ceilings by any method of attachment.  Spackling of all surfaces and application of texture finishes where adhesive

materials are used, radiant heat fill, and all preparatory work of spotting, pointing, taping, finishing and sanding of joints and surfaces, fireproof coatings, fiberglass coatings, exterior insulated wall systems, hardwood, prefinished doors, cabinets, sash, trim and furniture finishing, waxing, oiling, staining, application of hot and cold enamels, waterproofing, protective coatings, polyester, polyurethane, epoxy, resin and acrylic coatings.   The application of all paints, pigments, extenders, metal primers, metal pigments, binders, thinners, dryers, sealers, water colors, acoustical wall panels; i.e, stretch panels, etc., cathodic coatings, elastomeric roof coatings, liners, PVC liners, acid staining, epoxy coatings and any other treatment/coating applied to any surface including floors.  As applied by any method.  The preparation of interior and exterior surfaces with liquid steam, sandblast, waterblast, shotblast, or any other blast system or process including sandblast pot tending and preparation for metalizing and metalizing.  Painting work also includes the handling and all preparatory work incidental to painting, coating, paperhanging; removal, encapsulation, enclosure or any other activity pursuant to lead, chromium, zinc or other surface coating or contaminated surface abatement, painting, paperhanging, building of any structures or enclosures for both negative and positive pressure chambers pursuant to lead abatement or any other substrate cleaning process, decorating or drywall finishing of any surfaces, highway and parking lot striping and all other work which is usually executed by Painters, Decorators, Paperhangers, Hardwood Finishers and Drywall Tapers and Finishers, and the operation and care on the job site, of all tools and equipment used by all trades coming under the jurisdiction of the International Union of Painters and Allied Trades (IUPAT) including brushes, rollers, spray painting equipment, caulking guns, trowels, mops, squeegees or other miscellaneous hand and power-driven tools including sandblasting equipment, ladders, scaffolding and other rigging including but not limited to such equipment as mechanized or mobilized scaffolding which may be operated by Painters and the job site operation and maintenance of all types of compressors.

(Pls.' Ex. 2, § 2.1.)

23.     The Area Agreement provides health benefits, but no other fringe benefits for "pre-apprentices," and pre-apprentices receive a wage rate in the range of $11.26 through $13.31 as of November 1, 2007, $11.79 through $13.93 as of March 1, 2008, and $12.04 through $14.25 as of March 1, 2009.  The Area Agreement provides:

The term "Pre-Apprentice" as used in this Agreement means persons who perform preparatory work; protection, clean-up and care of job site, materials, and equipment; incidental to painting, coatings, sandblasting, paperhanging, drywall finishing, and parking lot striping.  No swing stage work or sandblasting shall be performed by a Pre-Apprentice.

(Pls.' Ex. 2, § 3.5, Sch. A.)

24.     The Area Agreement does not provide fringe benefits for "utility workers," and utility workers receive an hourly wage rate of $13.31 as of November 1, 2007, $13.93 as of

ORDER ON BENCH TRIAL GRANTING JUDGMENT IN FAVOR OF PLAINTIFFS - 7

March 1, 2008, and $14.25 as of March 1, 2009.  Section 3.6 of the Area Agreement defines "Utility Worker," as a

> person who perform[s] preparatory work; protection, clean-up and care of job site, materials, and equipment; incidental to painting, coatings, sandblasting, paperhanging, drywall finishing, and parking lot striping.  No application work or sandblasting shall be performed by a Utility Worker.

(Pls.' Ex. 2, § 3.6, Sch. A.)

25. Section 10.3 of the "Trusts" Article in the Area Agreement states in part as follows: "The Employer shall not be bound by the terms of any Trust Agreement or the actions of the Trustees of any Trust Fund unless the Employer is obligated to make contributions to such Fund pursuant to this Agreement."

26.     Section 17.4 of the Area Agreement states in relevant part, "It shall not be a violation of this Agreement for the Employer to pay wages in excess of the minimums contained herein."

27.     Reflective of the lowest hourly wage rate and lack of fringe benefits under the contract, Chris Winters, Business Representative for the Union, and Fernando Arevalo, Field Representative for the Union and formerly employed by the Employer as an apprentice for approximately five years, testified that the preparatory work performed by a Utility Worker is distinguishable from the preparatory work performed by a foreman, journeyman or painter. Arevalo testified that a utility worker prepares the job site, cleans the job site, moves equipment in and out of the job site, and assists workers in the shop.  A utility worker does not generally work at the job site.  Arevalo testified that an Employer's use of utility workers is rare and that in the five years that he worked for the Employer, he never encountered a utility worker.   In contrast, foremen, journeymen, painters and apprentices may prepare the painting surface or "substrate" for application of paint or other material.  A utility worker does not prepare the

painting surface or "substrate" for application of paint or other material.  (Winters Test. Tr.; Arevalo Test. Tr. I:153:2-155:6.)

28.    Although the Employer put on several witnesses, not one of them testified as to their understanding of a "utility worker" under any circumstance.

29.    Under the terms of the Area Agreement, the work for which contributions and dues must be paid is not determined solely by the title of the employee performing the work, however, but is determined by whether the work being performed is "fairly claimable as bargaining unit work:"

> *It is the intent of the Employer and the Union to protect all job-site work which has been traditionally performed by the bargaining unit or which is fairly claimable as bargaining unit work.*  Accordingly, except as provided in Section 5.1 of this Article, all painting work as defined in Article 2, Sections 2.1 and 2.2 shall continue to be performed on the job site or at any location designated by the Employer, by Employees covered under this Agreement, so long as it is within the geographic territory of the Union. . . .   The Employer shall not directly or indirectly perform, undertake, accomplish or attempt or indirectly to perform, undertake or accomplish any painting work, as defined in Article 2, Sections 2.1 and 2.2, except in complete compliance with all terms and provisions of this Agreement.

(Pls.' Ex. 2, § 5.2 (emphasis added).)

30.    Employees covered under the terms of the Area Agreement include all employees performing job functions within the scope of the Area Agreement, whether or not members of the Union and is not limited to Foremen, Journeymen, Painters, Utility Workers, Apprentices or Pre-Apprentice Painters:

> This Agreement applies to painting and drywall work to be done at the site of construction alteration, painting, or repair of a building, maintenance, or other work. These terms are to be interpreted and applied in accordance with the NLRA, as amended. The term Employee refers to persons performing job functions within the scope of this Agreement.  It does not refer to Union membership or affiliation, but does include Foreman, Painter, Journeyman, Utility Worker, Apprentice and Pre-Apprentice Painter. Work outside the scope of this Agreement is not covered by this Agreement.

(Pls.' Ex. 2, § 2.3.)

**2.      Fringe Benefit Payments.**

31.      Under the terms of Section 10.1 of the Area Agreement, "[e]ach Employer signatory to this Agreement is required to make reports to the Trusts (see Article 20) and remit with contributions, if any due, to Western Washington Painters Pension Trust, 201 Queen Anne Avenue N, Suite 100, Seattle, Washington 98109 (hereafter called the central distribution point) or such other place as may be designated."  (Pls.' Ex. 2, § 10.1.)

32.      Under the terms of Section 20.1 of the Area Agreement, "[a]ll Employers are expected to remit trust fund payments promptly, as set forth in the applicable trust agreements. In the event an Employer does not file a trust fund remittance report on a timely basis, or files a remittance report without enclosing full payment, the trust fund administrator shall contact such Employers immediately to demand payment, and shall so advise the Union."  (Pls.' Ex. 2, § 20.1.)

33.      Under the terms of Section 10.3 of the Area Agreement, "the Employer adopts and agrees to be bound by the terms of the Trust Agreements establishing the Funds referred to in this Article and agrees to be bound by all past and future lawful acts of the Trustees of each such Fund." (Pls.' Ex. 2, § 10.3.)

34.      The Trust Funds are third-party beneficiaries to the Shipyard Agreement and Area Agreement.

35.      The Trust Agreements require the Employers make contributions to the Trust Funds, and provide that the Trust Funds may collect delinquent contributions and inspect, examine and audit the employers records, and that the Employer will be liable for liquidated damages, interest, attorney's fees and costs incurred in the Trust Funds' efforts to collect delinquent contributions.  (Pls. Exs. 3-7.)

**E.       The Western Industrial, Inc. Audit**

36.       On March 2, 2009, Lindquist LLP, the Trust Funds' auditing firm, sent a letter to

the Employer requesting that arrangements be made to audit its records.   In the letter, the

auditors requested that Mr. Jackson make the following records available for inspection:

1.    All union agreements including, but not limited to, collective bargaining, compliance, project labor, and registration and counterpart agreements.  If you do not have copies please contact your Union Business Agent.
2.    Monthly transmittals showing names and hours reported to the Trust.
3.    Payroll and time records for all employees including, but not limited to, timecards, check registers, payroll journals, and certified payroll records.
4.    Documents used to facilitate reporting to the Trust (e.g. monthly hours summaries.)
5.    Quarterly and annual tax and wage reports including, but not limited to, Employment Security, Labor & Industries, and Federal Forms 941, 1099, and W-2.
6.    Listing of all projects worked and associated certified payroll records.
7.    Detailed documentation of job classifications of employees NOT reported to the Trust.
8.    Monthly transmittals to other Trust Funds.
9.    Cash disbursement journals.

(Pls.' Ex. 11; Walker Test. Tr. I:60:22-61:9.)

37.       Jackson acknowledged receipt of the letter and established that he had read the

letter in responding by letter dated March 19, 2009, stating:

Unfortunately the records in question are not available at this time, since the IRS is conducting an audit for the same time period.  We have not been informed when we can expect the records to be returned to us.

Additionally, I have a previous commitment to be out of country and therefore not available to be present for an audit conducted by your firm.

Please contact us during the week of May 11th, 2009 to reschedule an appointment.

(Pls.' Ex. 12; Walker Test. Tr. I:61:22-62:3.)

38.       On March 27, 2009, Lindquist sought assistance from Trust counsel to schedule

an audit of the Employer's records.  (Pls.' Ex. 13; Walker Test. Tr. 62:4-6.)

39.       On March 31, 2009, Trust counsel wrote a letter to the Employer again requesting

an audit of its records, reiterating the itemization of the records required by the auditor, including

"payroll and time records for your employees including, but not limited to, timecards, check registers, payroll journals, copies of quarterly payroll tax reports (Employment Security, IRS Form 941, and Labor & Industries) and certified payroll records, if any."   Trust counsel reminded the Employer that "the auditor is permitted to inspect all of your company's payroll records as confirmed by the United States Supreme Court decision, Central States Trust Fund v. Central Transport, 472 U.S. 559, 105 S. Ct. 2833, 86 L. Ed. 2d 447 (1985)."  (Pls.' Ex. 14.)

40.    On April 21, 2009, Mr. Jackson wrote a letter to the Union, giving his notice of the Employer's intent to terminate its agreement with the Union.

41.    With no response to the request for an audit from the Employer, on June 16, 2009, the Trust Funds filed a Complaint for Breach of Collective Bargaining Agreement and to Compel Inspection of Records in the United States District Court for the Western District of Washington and was assigned case number CV09-0826 RSM.  (Docket No. 1.)

42.    The Trust Funds made repeated, but unsuccessful, attempts to serve Mr. Jackson with the Summons and Complaint.  (Docket Nos. 2 and 3.)

43.    Without appearing in the case, the Employer submitted to an audit on July 31, 2009.  Andrew Walker (Walker) of Lindquist LLP performed the audit of the Employer's records.  (Walker Test. Tr. I:62-7-8.)

44.    The Employer provided Mr. Walker with the Employer's contributions reports already submitted to the Trust Funds, reports filed with the Washington State Employment Security Department (ESD) and the Washington State Department of Labor & Industries (L&I), employee time cards, payroll summaries for the employees already reported to the Trust Funds and the Employer's cash disbursement journal, but failed to provide the other records itemized in prior correspondence.  Significantly, the Employer failed to provide Mr. Walker with the Employer's payroll register and certified payroll reports, despite the repeated written requests

made of the Employer and reminder of the Employer's obligation to provide the payroll register to the auditor by law.  (Walker Test. Tr. I:63-64:2; II:121:4-123:7.)

45.    The Employer's reports submitted to ESD and L&I revealed that the Employer had reported approximately 64 employees as painters that had not been reported to the Trust Funds and the Union.  (Walker Test. Tr. I:66-1-23; II:123:8-14.)

46.    During the first day of the audit, when Mr. Walker asked the Employer to explain the discrepancy, the Employer asserted that these employees were "utility workers" for which no dues or contributions were owing.  The Employer did not explain or provide the auditor with any documentation establishing what a utility worker was, the type of work performed by a utility worker, a utility worker's compensation package, including rate of pay and benefits – the kind of information requested of the employer in the letter preceding the audit - "detailed job classifications of employees NOT reported to the Trust."  The employer did not go employee by employee explaining what each one did, or state that it did not have the records because it was also are being audited by the Internal Revenue Service, as previously stated in the Employer's letter to the auditor. (Walker Test. Tr. I:93:21-95:1; II:123:15-124:6; Pls.' Ex. 11.)

46.    In an attempt to verify the Employer's assertions, the auditor again requested the Employer's payroll register.   The Employer again refused and stated that only the payroll summaries for the employees already reported to the Trust Funds would be provided.  (Walker Test. Tr. II:122:14-123:7.)

48.    When the auditor returned for a second day approximately a month later, the Employer still provided no payroll register, no certified payroll reports, no explanation or documentation establishing what a utility worker was, the type of work performed by a utility worker, a utility worker's compensation package, including rate of pay and benefits – the kind of information requested of the employer in the letter preceding the audit - "detailed job classifications of employees NOT reported to the Trust."  The Employer neither went through

ORDER ON BENCH TRIAL GRANTING JUDGMENT IN FAVOR OF PLAINTIFFS - 13

employee by employee explaining the work performed by each nor said that the records were not available because of the Internal Revenue Service audit, as previously stated in the Employer's letter to the auditor.  (Walker Test. Tr. I:93:21-95:1; II:124:7-125:22; Pls.' Ex. 11.)

49.    The auditor determined that the Employer's contribution reports were inaccurate. With nothing to verify the Employer's assertion, Lindquist LLP prepared the audit report listing the unreported painters as journeyman "misclassified as utility workers."  The report included various other relatively small miscellaneous underpayments.  (Walker Test. Tr. II:127:17-128:7.)

50.    Mr. Jackson subsequently retained counsel and a number of the miscellaneous underpayment entries were resolved and removed from the report, but some remained along with all of the "misclassified utility workers."  (Walker Test. Tr. II:128:8-16.)

51.    Lindquist LLP revised the report on July 29, 2010 ("first revised audit report"). (Pls.' Ex. 9.)  The first revised audit report shows a total amount in underpayments in contributions and dues owing to the Trust Funds and the Union of $190,060.17 and total liquidated damages, interest and testing fees of $58,602.15, for an overall total owing to the Trust Funds and the Union of $248,662.32.  (Pls.' Ex. 9.)

52.    The Employer failed to pay the amounts set forth in the audit report, and on October 12, 2010, based on the first revised audit report, the Trust Funds and the Union filed and served an Amended Complaint for Breach of Collective Bargaining Agreement ("Amended Complaint") in the existing lawsuit seeking payment of the unreported contributions, liquidated damages, interest, audit fees, attorneys' fees and costs.  (Docket No. 9.)

53.    The Trust Funds and the Union also named Applicators as a defendant as the Employer's alter ego liable for the Employer's delinquent contributions and associated charges. (Docket No. 9.)  The Trust Funds and the Union also named Mr. Jackson as individually liable under the terms of the Trust Agreements for the Employer's delinquent contributions and associated charges.  (Docket No. 9.)

ORDER ON BENCH TRIAL GRANTING JUDGMENT IN FAVOR OF PLAINTIFFS - 14

54.    On November 24, 2010, the Employer and Jackson filed an Answer.  (Docket No. 13.)  On December 8, 2010, Applicators filed an Answer.

55.    Counsel for the Trust Funds and the Union took Mr. Jackson's deposition on August 17, 2011, during which counsel for the Trust Funds and the Union asked Mr. Jackson to provide payroll records in order to verify its "utility worker" assertion.  In response, Mr. Jackson provided payroll summaries covering the period of the audit (11/1/07 – 6/30/09) only for the workers listed as utility workers and for selected periods within the period of the audit report.  (Defs.' Ex. 1; Walker Test. Tr. II:129-16-130:4.)

56.    Mr. Walker, who performed the audit of the Employer's records, could not use the payroll summaries because they did not contain data that would allow him to cross check the information reported for the "misclassified utility workers" against other workers, and the veracity of the data could not be confirmed because it had been selected by the Employer.  (Walker Test. Tr. II:129:16-130:4.)

57.    On September 27, 2011 the Employer provided its payroll register in electronic format to counsel for the Trust Funds and Union, who in turn forwarded it to Mr. Walker.  (Pls.' Ex. 15; Walker Test. Tr. II:130:5-11.)

58.    After analyzing the payroll register, Mr. Walker was able to resolve nearly all of the remaining miscellaneous underpayments, but not the Employer's assertion that the unreported workers were "utility workers" for which no contributions were owing.  (Walker Test. Tr. I:77:6-21.)

59.    The payroll register identified the hours of the employees listed on the audit report as utility hours.  The payroll register also showed the wage rates that the employees were paid and the jobs they were working on at the time.  (Walker Test. Tr. I:91:18-22.)  Mr. Walker found the Employer's classifications of the employees as utility workers unreliable.  The vast majority of those designated with a "utility" classification received an hourly wage rate of $20 or

more, the level of a journeyman wage rate, as opposed to a utility worker wage rate of $13 to $14 per hour, as set forth in the wage and fringe benefit schedules attached to the Shipyard and Area Agreements.  (Walker Test. Tr. I:76:12; Pls.' Exs. 1 and 2, Sch. A.)

**F.    The Employer's Classification Of Non-Union Workers As Utility Workers and Gary Austin**

60.    The initial audit report listed Gary Austin as an unreported "misclassified utility worker." (Walker Test. Tr. I:77:17-78:7.)

61.    Gary Austin signed an unsworn statement dated July 15, 2010 representing that he had worked as a project estimator for the period August 11, 2008 through March 1, 2009, the total time that he was employed by the Employer.

62.    Gary Austin's name was removed from the audit report based upon this representation and does not appear on the first revised audit report.

63.    The Employer's payroll register received on September 27, 2011 showed that Gary Austin was classified as a "utility worker" receiving an hourly wage of $27 per hour and his hours assigned to specific jobs the first four months of his employment with Western Industrial.  The payroll register showed that Gary Austin worked as a project estimator receiving a monthly salary with none of his time assigned to jobs for the remaining three months of his employment.  (Walker Test. Tr. I:77:17- 78:7.)

64.    Gary Austin's name was placed back onto the audit and appears in the second revised audit report for the period that he was classified by the Employer as a "utility worker" receiving $27 per hour.  (Walker Test. Tr. I:77:17-78:7.)

65.    Contrary to his statement, Gary Austin testified at trial under oath that he worked as a foreman for the first four months of his employment with Western Industrial, not as a project estimator, and worked as a project estimator for the last three months of his employment.  Mr. Austin testified that he supervised jobs.  (Austin Test. Tr. II:90:13-91:8.)

67.     Gary Austin testified that he was not a member of the Union during his employment with Western Industrial.  (Austin Test. Tr. II:102:9-11.)

68.     Under the terms of the Shipyard Agreement and Area Agreement, Western Industrial was obligated to make contributions to the trust funds on behalf of Gary Austin as a foreman, whether or not he was a member of the Union.  (Pls. Ex. 2.)

69.     Rather than properly classify Gary Austin as a foreman/journeyman for purposes of trust fund contributions, Hiltrud Rowan misclassified Gary Austin as a "utility worker" because he was not a member of the union.  Western Industrial made no contributions to the trust funds on behalf of Gary Austin.  Gary Austin was not a "utility worker."  (Rowan Test. Tr. II:70:23-24.)

**G.     The Testimony Of Fernando Arevalo**

70.     Fernando Arevalo of the Union recognized many of the names on the first and second revised audit reports of individuals that he personally knows as sandblasters and/or painters, not utility workers.  Mr. Arevalo testified that he never ran across a utility worker at Western Industrial the entire time he was employed.  According to Arevalo, everyone working for the Employer was either a journeyman or an apprentice.  (Arevalo Test. Tr. I:152L11-153:1;157:1-160:4.)

**H.     The Testimony Of Juan Luna**

71.     Juan Luna, employed by the Employer and classified by the Employer as a "utility worker" during the period of the audit testified at trial that he and many other employees listed on the audit report as "misclassified utility workers" and classified in the Employer's payroll register as "utility" were sandblaster/painters and only performed sandblasting/painting work for the Employer during the period of the audit and every other period they have worked for the Employer.  He also identified many others appearing on the first and second revised audit reports

as "misclassified utility workers" as sandblaster/painters as well, not utility workers.  They had worked alongside these employees on projects for the Employer during the period of the audit.

72.     Juan Luna worked for the Employer for the period 2007 to 2008.  He lived in Houston, Texas at the time.  He performed sandblasting and painting work for the entire time he worked for the Employer.  Specifically he took off all the paint on vessels, as well as the dirt and rust and occasionally cleaned up.  He used overalls, mask, and gloves, and something to cover his head.  He applied protective covering in the work area to prevent overspray of the paint when he was inside the tank, but when he was outside, sometimes he didn't do it.  Occasionally, he mixed paint.  (Luna Test. Tr. I:123:13-124:16.)

73.     Juan Luna admitted that his use of the term "painter" and/or "sandblaster" included all the "Utility Worker" duties set forth in Section 3.6 of the Area Agreement, in addition to actual sandblasting and painting. (Vol. I, Tr. 139, 142-145.)  In addition, he provided no specific testimony about himself or other utility workers he observed, regarding the amount of time spent actually sandblasting or painting, versus the other work performed under the Area Agreement's "Utility Worker" classification.

73.     Luna has ten years' experience in the marine painting industry.  Luna learned sandblasting at the shipyard prior to working for the Employer.  (Luna Test. Tr. I:134:24-135:11.)  Luna learned painting as a helper to a friend.  (Luna Test. Tr. I:136:5-8.)

74.     Luna received a journeyman sandblaster/painter wage rate of $20 an hour when he started working for the Employer, which amount was offered to Luna by Jim Smith and Estaban Acosta.  (Luna Test. Tr. I:136:22-137:8.)

75.     Luna regarded himself as a sandblaster and a painter, not a utility worker.  He testified that he did not know what a utility worker is and emphatically stated that he was a sandblaster and a painter:

Q:      What kind of work did you do for Western Industrial?

ORDER ON BENCH TRIAL GRANTING JUDGMENT IN FAVOR OF PLAINTIFFS - 18

1     A:      Sandblasting, painting.

2     Q:      For the entire time?

3     A:      Yes.

     . . . .

5     Q:      As a painter, would they do the coverup?

    A:      Yeah.  I'm a painter and sandblaster, and I did it.

     . . . .

    Q:      Could the painter or sandblaster operate the scissor lift to get up and down?

8     A:      Yeah, I used to do it.

     . . . .

10    Q:      Now, you yourself sandblasted?

11    A:      Yeah.  I am a sandblaster and painter.

12      . . . .

13    Q:      What was required – sorry.  I'll back up.
                 Obviously you're a painter.  Did you just use a sprayer?

14    A:      No, no.  I painted and sandblasted.

15      . . . .

17    Q:      How much of the time, when you were at Western Industrial on a typical job, were you actually sandblasting versus everything else we've talked about?

18    A:      I would sandblast, two, three, four hours.  Just breaks for drinking water.

19    Q:      And then you also performed the other responsibilities that we talked about?

20    A:      No, no, no, no.

21    Q:      What would you do?

22    A:      I would go back to sandblast.

     . . . .

23

24    Q:      Do you know what a utility worker is in the painting world?

1      A:     No

2 (Luna Test. Tr. I:123:22-25; I:139:19-21; I:140:18-20; I:143:6-7; I:144:23-145:1; I:145:14-23; and 133:15-17.)

3      76.     Luna identified others on the audit report as performing journeyman or apprentice

4 sandblasting and/or painting work during the period of the audit, including Estaban Acosta, K.

5 Allison, Ayala, Bautista, Kyle Belcher, Carlos Bolivar-Mejia, Odell Cage Jr., Odell Cage, E.

6 Ceja, Ceja-Flores, L. Ceja, Ceja Reyes, Fileberto Cervantes Ibarra, Chavez, Ricardo Duran,

7 Eduardo Vasquez, Javier Enriquez, Sean Fry, Antonio Gonzales and the rest of the Gonzaleses,

8 J. Hulce, Alfonso Linares, Herberto Lopez, M. Lopez, Lopez-Ruiz, Ricardo Macias, Horacio

9 Marquez, Orlando Marquez, Mr. Medina, Jose Osequera, Mario Ramirez, A. Rodriques, Sergio

10 Sandoval, Manuel Santamaria, Nemorio Santamaria, Clemente Santos, Frank Vargas and all of

11 the employees that came up from Texas and California.  (Luna Test. Tr. I:124:17-133:14.)

12 **L.**     **Delinquent Contributions, Dues, Liquidated Damages, Interest, And Audit Fees.**

13      77.     On October 10, 2011, Lindquist LLP again revised the audit report ("second

14 revised audit report").  (Pls.' Ex. 10.)  The 64 "misclassified utility workers" remain in the

15 second revised audit report because the auditor found Employer's classification of "utility" in its

16 payroll register is extremely unreliable.  (Pls.' Ex. 10.)  Consequently, the second revised audit

17 report shows a total amount in underpayments in dues and contributions owing to the Union and

18 Trust Funds of $194,053.60 and total liquidated damages, interest computed to December 30,

19 2009 and testing fees of $76,690.33, for an overall total owing to the Union and Trust Funds of

20 $270,743.93, summarized as follows:

| THE BREAKDOWN BY TRUST IS: | UNDER PAYMENTS | IMPROPER PAYMENTS |
|---|---|---|
| HEALTH & WELFARE | $105,469.79 | $385.95 |
| PENSION | 32,971.33 | 3,836.97 |
| LMCC | 1,134.43 | 4.15 |
| APPRENTICE TRAINING | 11,340.82 | 41.50 |
| IUPAT | 22,220.19 | 78.85 |
| SPECIAL | 1,134.43 | 4.15 |
| DUES | 19,782.61 | 34.18 |

| | UNDER PAYMENTS | IMPROPER PAYMENTS |
|---|---|---|
| SUBTOTAL | 194,053.60 | 4,385.75 |

THE BREAKDOWN BY TRUST IS:

| | UNDER PAYMENTS | IMPROPER PAYMENTS |
|---|---|---|
| LIQUIDATED DAMAGES | $17,183.37 | |
| LIQUIDATED DAMAGES - IUPAT | 4,444.22 | |
| INTEREST THROUGH DECEMBER 31, 2009 | 25,644.56 | |
| INTEREST THROUGH DECEMBER 31, 2009 - IUPAT | 3,314.18 | |
| TESTING FEES | 21,872.00 | |
| TESTING FEES - IUPAT TOTAL | 4,232.00 | . |
| TOTAL | $270,743.93 | $4,385.75 |

(Pls.' Ex. 10.)

**M.      Applicators, Tools and Equipment, Inc. Liability.**

111.    The parties stipulated to Defendant Applicators' liability for the Employer's obligation to pay delinquent contributions, dues, liquidated damages, interest, audit fees and attorneys' fees and costs resulting from this lawsuit.

**N.      Individual Liability.**

112.    The Trust Agreements for the Western Washington Painters Defined Contribution Pension Trust, Employee Painters' Trust Health and Welfare Fund, Western Washington Apprenticeship and Training Trust, and Western Washington Painters' Labor Management Cooperation Trust clearly and explicitly state that corporate officers responsible for making contributions to the Trust Funds will be individually liable for payment of any delinquent contributions, liquidated damages, interest, audit fees and attorneys' fees and costs incurred in collection:

> In recognition that individuals have responsibilities in a corporation which is a participating Employer in a Trust, and that contributions are for the welfare of covered employees, the responsible individuals in a corporation which is a participating Employer shall be individually liable for payment of contributions and other charges owing under this Article VIII.  Therefore, in the event any corporate Participating Employer which is obligated to make contributions to the Trust fails to make such contributions, the President, the Treasurer, and any other corporate officer who is responsible for payment of contributions by the corporation to the Trust fund shall be each individually liable for the payment of contributions and other amount due under this Article VIII, and under applicable Federal law, 29 U.S.C. Section 1132(g).

1  (Pls.' Exs. 3-6.)

2

3  ### III. CONCLUSIONS OF LAW

4  The central contention in this litigation is whether the Employer improperly misclassified

5  certain employees as "utility workers," as that term is used in the Shipyard and Area

6  Agreements.  Both parties dedicated considerable trial time to convincing the Court to adopt its

7  particular definition of the term "utility worker."  Ascertaining the meaning of the term "utility

8  worker," however, is unnecessary to the resolution of this lawsuit.  Defendants failed to produce

9  any evidence that the allegedly misclassified workers were performing "utility work," under *any*

10  definition of the term.  Applying the burden-shifting framework mandated by the Ninth Circuit,

11  Defendants accordingly fail to meet their burden of proving that contributions are not owed.  The

12  remedy for such a failure is payment of the owed Trust Fund contributions with interest, costs,

13  and attorneys fees.  The parties stipulate that Defendant Applicators is liable for amounts owed

14  by the Employer.  Defendant Walker is also liable under the terms of the Trust Agreements.

15  **A.  Burden Shifting Framework**

16  29 U.S.C. § 1059(a)(1) of ERISA imposes a statutory duty upon employers to maintain

17  records sufficient to determine the benefits due to its employees and to enable the plan

18  administrator to generate reports required by statute.  *Brick Masons Pension Trust v. Industrial*

19  *Fence & Supply, Inc.,* 839 F.2d 1333 (9th Cir.1988).  "An employer cannot escape liability for

20  his failure to pay his employees the wages and benefits due to them under the law by hiding

21  behind his failure to keep records as statutorily required."  *Id.* at 1338.  Thus, "once the Trustees

22  show (1) that [the employer] failed to keep adequate records, and (2) that there exist some

23  employees who (a) performed covered work that was (b) unreported to the trust funds, then the

24  burden shifts to the employer to show the extent of the unreported covered work for those

1  employees." *Motion Picture Industry Pension & Health Plans v. N.T. Audio Visual Supply, Inc.*,

2  259 F.3d 1063, 1066 (9th Cir.2001).

3  **B.  Failure to Keep Adequate Records**

4        Plaintiffs' first threshold burden is to show that the Employer failed to keep adequate

5  records. *Motion Picture Indus.*, 259 F.3d at 1066.  The Employer asserts that, since Plaintiff

6  Trust Funds have been provided clear payroll records confirming that the employees at issue

7  were contemporaneously characterized as "utility workers," the burden remains on Plaintiffs to

8  establish that the individuals at issue were *not* performing utility work.  The Court disagrees.

9        The audit performed of the Employer's records by Lindquist LLP, an independent

10  auditing firm, established that the Employer's contribution reports that were filed with the Trust

11  Funds were inaccurate because they failed to include approximately 64 employees that the

12  Employer reported to the Washington Department of Labor & Industries as painters.  The

13  Employer claimed that the unreported employees were "utility workers" for which no

14  contributions were owing.  However, the Employer failed to provide the auditor with the

15  Employer's payroll register, certified payroll reports or any documentation that would reflect the

16  unreported employees' classification as "utility workers" and detailed documentation describing

17  a utility worker and the work performed by a utility worker.

18        Approximately one month before trial, the Employer provided the auditor with, first,

19  payroll summaries and, later, its entire payroll register.  The payroll register indicates that the

20  employees in question were contemporaneously classified as "utility workers."  However, the

21  Employer never provided the auditor or the Trust Funds or the Union with any detailed

22  documentation kept by the Employer that describes what a utility worker is according to the

23  Employer or the type of work performed by a utility worker.  Indeed, the only new information

24  that the auditor gleaned from the payroll register was the wage rates paid to the alleged "utility

1   workers" and the jobs that they were working on.  The wage rates were commensurate with

2   journeyman wage rates.

3       The inadequacy of the records kept by the Employer is perhaps best exemplified by

4   presenting a counterfactual: had Defendant kept personnel files, job descriptions, or other

5   documentation listing the specific duties assigned to each of its workers, then this litigation

6   would be in a very different posture.  Based on such documentation, perhaps Plaintiffs would

7   continue to insist that the unreported workers were not in fact "utility workers."  The Court could

8   then make the legal determination of whether the Employer's classification of "utility worker",

9   or the definition employed by the Plaintiffs, was correct.

10      In contrast, here the Employer did not maintain any such records.  The only record that

11  the Employer provided supporting its classification of the unreported workers as "utility

12  workers" was its payroll register.  The contemporaneous classification of the hours worked by

13  such employees as "utility" hours only demonstrates that those hours were classified as hours for

14  which no fringe benefits were due both in the past, and at the time of the audit.  It does not

15  demonstrate or provide any support for the contention that the hours worked were actually hours

16  in which the unreported employees were engaged in "utility" work.

17      The Ninth Circuit has squarely placed the burden on Defendants in cases like this to

18  produce records that support its contention that contributions are not due.  *See Brick Masons*, 839

19  F.2d 1333.  For the Court to hold that the payroll register provided by the Employer in this case

20  is sufficient to satisfy Defendants' burden in *Brick Masons* would be to turn *Brick Masons* on its

21  head.  Such a holding would suggest that, while ERISA requires an employer to maintain records

22  of hours worked by its employees, it does not require the employer to keep records that would

23  demonstrate, for instance, whether those hours are covered by a collective bargaining agreement

24

1    or whether those hours are hours for which fringe benefits are due.  Defendants point to no legal

2    authority that would support that distinction.  Further, such a distinction would effectively

3    eliminate the burden shifting established under *Brick Masons:* it would reward employers for

4    obfuscating job classification systems and effectively require that plaintiffs call as a witness each

5    and every employee classified as non-covered, or not entitled to fringe benefits, in order to

6    prevail in a case such as this.  There is no indication in the case law or in the language of the

7    statute that Congress intended to shift the burden to employees in this manner.

8         Indeed, *Motion Picture Indus.* involved a dispute as to whether a corporation's employees

9    had performed covered work for which contributions were not paid.  259 F.3d at 1064.  There,

10   the Ninth Circuit held that two auditors' affirmative declarations that the companies' records

11   "frequently failed to identify the type of work performed" and were "insufficiently detailed to

12   allow him to identify the type of work performed" satisfied the plaintiffs' first threshold burden

13   of showing that the corporation had failed to keep adequate records.  Here, as in *Motion Pictures*

14   *Indus.*, the Trusts' auditor, Mr. Walker, found the Employer's records insufficient to establish the

15   type of work performed by those employees classified as "utility workers."  Thus, Mr. Walker's

16   testimony that the Employee's records were insufficient to determine whether the contested

17   employees were utility workers satisfies Plaintiffs' first threshold burden of showing that

18   Defendants failed to maintain adequate records.

19   **C. Fact of Some Damage**

20        Plaintiffs' second threshold burden is to demonstrate the fact of damage, or that "there

21   exist some employees who (a) performed covered work that was (b) unreported to the trust

22   funds."  *Motion Picture Indus.*, 259 F.3d at 1066.  Plaintiffs have also satisfied this burden.

23        Defendants contend that Section 3.6 of the Area Agreement defines the scope of "utility"

24   work as to all of the work performed by the Employer.  Plaintiffs dispute that Section 3.6 applies

1  to maritime work covered by the Shipyard Agreement, but for the purposes of this argument, the

2  Court will assume that Defendants' interpretation is correct.  The parties also dispute the scope

3  of work covered by Section 3.6.  Again, for purposes of this argument, the Court adopts the

4  Defendants' interpretation: that "utility" work encompasses a broad array of "preparatory" tasks

5  and only precludes actual spray painting/application and/or actual sandblasting.

6       Even using Defendants' interpretation of "utility" work, Plaintiffs have satisfied their

7  burden of showing that some employees performed work that exceeded the scope of "utility"

8  work, were accordingly owed fringe benefits, and were not reported to the Trust Funds.

9       At trial, Juan Luna, one of the unreported employees listed on the audit report, testified

10  that he and many others listed on the audit report (approximately 40 others) performed

11  sandblasting and painting work for the Employer during the period of the audit.  Defendants

12  argue that Mr. Luna's characterization of his and others' work as "painter" or "sandblaster" work

13  included all of the work set forth in Section 3.6 of the Area Agreement, including preparation,

14  containment, protection, set-up, clean-up, work incidental to sandblasting and painting involving

15  assistance to the actual painter(s) and sandblaster(s), remasking, and demobilization.  According

16  to Defendants, the performance of this work is perfectly allowable and creates no liability for

17  defendants.  Mr. Luna, however, also testified that he performed actual spray painting and

18  sandblasting.  (Luna Tr. Test. I:143:6-146:22.) As Defendants concede, at minimum, Section 3.6

19  precludes utility workers from performing actual spray painting or sandblasting.   Therefore,

20  even using Defendants' broad definition of "utility" work, Luna engaged in work that fell outside

21  the scope of "utility" work, yet those hours were not reported to the Trusts.

22       Also at trial, Fernando Arevalo, a union representative formerly employed by the

23  Employer as an apprentice painter and sandblaster, testified that he recognized many of the

24

ORDER ON BENCH TRIAL GRANTING JUDGMENT IN FAVOR OF PLAINTIFFS - 26

names on the audit report as sandblasters and painters.  Mr. Arevalo also testified that he never ran across a "utility worker" during the five years that he worked for the Employer.

Additionally, Gary Austin, a witness called by the Employer at trial, had initially been included in the audit report as an unreported painter but removed based on an unsworn statement signed by him in which he represented that he had worked as a project estimator for the Employer during his employment.  Upon reviewing the Employer's payroll register, the auditor discovered that for the first three to four months of Mr. Austin's employment, the Employer had labeled Mr. Austin as a "utility worker," paid him an hourly wage of $27 per hour and allocated his hours to projects in the field.  For the remaining three months of Mr. Austin's employment, the Employer labeled Mr. Austin as a project estimator, paid him a monthly salary, and stopped allocating his salary to projects in the field.

Contrary to his unsworn statement, Mr. Austin testified under oath at trial that he was not a project estimator or a utility worker during the first three to four months of his employment with the Employer, but that he was a foreman supervising employees on project sites.  The Employer's explanation for the differing treatment of Mr. Austin changed over time.  First, the Employer was attempting to "cost" his salary as a project estimator to projects.  Second, the Employer mislabeled him as a "utility worker" because he was nonunion even though he performed the job of a foreman and not a utility worker.  Nonunion workers are covered by the Shipyard Agreement and the Employer is required to pay trust fund contributions on their behalf.

Plaintiffs have satisfied their burden of showing that covered work for which fringe benefits were owed was performed and unreported to the Trusts.

**D. Defendants' burden**

The Employer has failed to satisfy its burden to establish the precise amount of contributions owing.  The Employer offered no evidence to contradict the testimony of Mr. Luna

1 or Mr. Arevalo concerning their testimony that Mr. Luna and many other unreported employees

2 listed on the audit report performed sandblasting and painting work.  The Employer's own

3 witnesses testified that the Employer misidentified Mr. Austin as a utility worker in its payroll

4 register when he actually was a foreman solely because he was not a member of the union,

5 calling into question the Employer's criteria used to determine when to label an employee as a

6 "utility worker."

7      Moreover, the Employer failed to offer any evidence that would establish the precise

8 amount of contributions owing other than the full amount established by the audit report.  The

9 Employer failed to offer any testimony or evidence that addresses the audit report employee by

10 employee that would establish the type of work each employee was performing in order to

11 reduce its contribution obligation under the audit report.  Jackson did not present such evidence,

12 even though he is the owner of the company and testified that he interviewed and hired all of his

13 employees into positions based on their skill and experience.  Hiltrud Rowan testified that she

14 did not know what the employees did and that she relied on the classification given to them by

15 Jackson.  Austin, who testified that he was a foreman that supervised employees in the field,

16 could not recall the names of the employees he supervised and did not describe the work any of

17 the individuals listed on the audit report performed.  Wyllys was not employed by WI and simply

18 had no knowledge of the work performed by the individuals listed on the audit report.  Having

19 failed to meet their burden, Defendants are liable to Plaintiffs.

20 **E.  Remedy**

21      The Employer argues that even though the unreported employees may have performed

22 sandblasting and painting work, under Section 3.6 of the Area Agreement, the only remedy

23 available for misclassification of utility workers is for the employee to be paid the difference

24 between the wage rate of a "utility worker" and a "journeyman" for the time spent performing

1    sandblasting and painting work.  Defendants further content that the term  "wages" under Section

2    3.6 does not include fringe benefits.

3           Section 3.6 provides in relevant part:

4           … No application work or sandblasting shall be performed by a Utility Worker.
            If any contractor is found in violation of this article, he/she shall forfeit his/her
5           right to use Utility Worker for the remainder of the contract and shall pay
            Journeyman wages to the Utility Worker for the period of time he/she was
6           performing non-Utility work.   Utility Workers shall not exceed 25% of the
            Employer's workforce.
7
            Defendant's interpretation of the remedy provision of Section 3.6 of the Area Agreement
8
     is unreasonable. The term "wages" in this provision of the agreement includes contributions for
9
     an employee's health and pension funds.  Other courts have found that the meaning of "wages"
10
     in a collective bargaining context includes fringe benefits.  *See Int'l Longshoremen's &*
11
     *Warehousemen's Union v. Cargill, Inc.*, 372 F. Supp. 807, 808-09 (N.D. Cal. 1974) (citing
12
     *Inland Steel v. NLRB*, 170 F.2d 247 (7th Cir. 1948); *Puma v. Brandenburg*, 324 F. Supp. 536
13
     (S.D.N.Y. 1971)).
14
            Further, a court "must read [a contract] as the average person would read it; it should be
15
     given a practical and reasonable rather than a literal interpretation, and not a strained or forced
16
     construction leading to absurd results." *Allstate Ins. Co. v. Hammonds*, 72 Wash. App. 664, 667
17
     (1994).  To read Section 3.6 as the Employer has suggested would lead to absurd results by
18
     transforming a sanction into an incentive.  An Employer could theoretically classify all of its
19
     employees as "utility workers" if they performed some duties that fell within this very broad
20
     definition of "utility worker" it has put forward.  The Employer could direct its employees to
21
     perform painting and sandblasting work, and the work described in the definition of "utility
22
     worker," call them utility workers, violate Section 3.6, pay them journeymen wages and
23
     ultimately save money by not providing them health and pension benefits.  It could not have
24

1  been the parties' intention that the Employer be permitted to avoid its entire fringe benefit

2  contribution obligations.

3          Accordingly,  pursuant to the terms of the Shipyard Agreement, Area Agreement, Trust

4  Agreements, § 302(c)(5) of the Labor-Management Relations Act, 29 U.S.C. § 186(c)(5) and

5  §§ 502(d)(1), 502(a)(3) and 515 of the Employee Retirement Income Security Act of 1974, 29

6  U.S.C. § 1001 et seq.,the Trust Funds and the Union are entitled to:

7          a.      An award in the amount of the delinquent contributions, dues, interest and

8  audit fees for all employees listed on the audit report as follows:

9

10  | THE BREAKDOWN BY TRUST IS: | UNDER PAYMENTS |
| --- | --- |
| HEALTH & WELFARE | $105,469.79 |
| PENSION | 32,971.33 |
| LMCC | 1,134.43 |
| APPRENTICE TRAINING | 11,340.82 |
| IUPAT | 22,220.19 |
| SPECIAL | 1,134.43 |
| DUES | 19,782.61 |
| **SUBTOTAL** | **194,053.60** |

| THE BREAKDOWN BY TRUST IS: | UNDER PAYMENTS |
| --- | --- |
| **LIQUIDATED DAMAGES** | $17,183.37 |
| **LIQUIDATED DAMAGES - IUPAT** | 4,444.22 |
| **INTEREST THROUGH DECEMBER 31, 2009** | 25,644.56 |
| **INTEREST THROUGH DECEMBER 31, 2009 - IUPAT** | 3,314.18 |
| **TESTING FEES** | 21,872.00 |
| **TESTING FEES - IUPAT TOTAL** | 4,232.00 |
| **TOTAL** | **$270,743.93** |

20          b.      Interest from December 31, 2009 through the date of Judgment.

21          c.      Attorneys' fees and costs incurred by the Trust Funds and the Union in

22  efforts to collect the amounts due hereunder.  *See Northwest Administrators, Inc. v. Albertson's*

23  *Inc.*, 104 F.3d 253, 257-58 (9th Cir. 1996) (holding that an award of attorneys' fees and

24

liquidated damages in an action brought by the fiduciary of a multiemployer plan to recover unpaid contributions is mandatory where (1) the employer is delinquent at the time the action is filed; (2) the district court enters a judgment against the employer; and (3) the plan provides for such an award).  *See also* Pls.' Exs. 3-7 (Trust Agreements, Shipyard Agreement and Area Agreement all provide for the award of attorneys' fees and costs).

                d.      Post-judgment interest.

According to the stipulation of the parties, Applicators, Tools and Equipment, Inc., is liable for the amounts owing by the Employer to the Trust Funds and the Union.

Further, the Trust Agreements for the Western Washington Painters Defined Contribution Pension Trust, Employee Painters' Trust Health and Welfare Fund, Western Washington Apprenticeship and Training Trust, and Western Washington Painters' Labor Management Cooperation Trust clearly and explicitly state that corporate officers responsible for making contributions to the Trust Funds will be individually liable for payment of any delinquent contributions, liquidated damages, interest, audit fees and attorneys' fees and costs incurred in collection.  (Pls.' Exs. 3-6, §§ VIII(8)).  The Court must enforce explicit and unambiguous clauses, such as these, to hold corporate officers personally liable for the delinquent contributions and associated payments of the corporate employer.  *See Employee Painters' Trust v. J&B Finishes,* 77 F.3d 1188, 1192 (1996).  Contrary to Defendants' argument, Mark Jackson's failure to sign the Trust Agreements themselves does not absolve him of liability.  As in *J&B Finishes,* even if Jackson "did not read the agreements or understand their potential for imposing personal liability, he bound himself to those agreements when he signed the counterpart [Shipyard] agreement."  *Id.*  Therefore, Mark Jackson and Jane Doe Jackson, husband and wife, and the marital community comprised thereof, are liable for the amounts owing by the Employer to the Western Washington Painters Defined Contribution Pension Trust, Employee Painters'

1  Trust Health and Welfare Fund, Western Washington Apprenticeship and Training Trust, and

2  Western Washington Painters' Labor Management Cooperation Trust and the Union, pursuant to

3  the terms of the respective Trust Agreements.

4                              **IV. CONCLUSION**

5          Having fully considered the evidence presented at trial, the exhibits admitted into

6  evidence, and the argument of counsel, and being fully advised, the Court renders its decision as

7  set forth above.  The Clerk of the Court is directed to forward a copy of this Order to all counsel

8  of record.

9

10

11          Dated August 27, 2012.

12

13

14

15

16                              RICARDO S. MARTINEZ
                                UNITED STATES DISTRICT JUDGE
17

18

19

20

21

22

23

24